**GRANADA INVESTMENTS, INC., Plaintiffs,**

v.

**DWG CORPORATION, et al., Defendants.**

**DWG CORPORATION, By and Through Irving CAMEON, et al., Plaintiffs,**

v.

**Victor POSNER, et al., Defendants.**

**Irving G. and Benice BRILLIANT, Trustees, et al., Plaintiffs,**

v.

**DWG CORPORATION, et al., Defendants.**

**DWG CORPORATION, et al., Plaintiffs,**

v.

**GRANADA INVESTMENTS, INC., Defendant.**

**Nos. 1:89CV0641, 1:92CV1164 and 1:92CV1206.**

United States District Court, N.D. Ohio.

April 26, 1993.

**450**

Frances Floriano Goins, Charles F. Clarke, Alan P. Buchmann, Stacy D. Ballin, Howard Nichols, Squire, Sanders & Dempsey, Cleveland, OH, for Granada Investments, Inc.

Michael J. Pucillo, Greenfield & Chimicles, West Palm Beach, FL, Dennis E. Murray, Jr., Murray & Murray, Sandusky, OH, for Irving Cameon.

Steven S. Kaufman, Gail E. Sindell, Kaufman & Cumberland Co., L.P.A., Cleveland, OH, T.S.L. Perelman, Fort & Schlefer, Washington, DC, for Irving and Benice Brilliant.

Neale M. Albert, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for DWG Acquisition Group, L.P.

Norman S. Jeavons, John P. Witri, Daniel Mascaro, Paul Eyre, Baker & Hostetler, Cleveland, OH, Martin Rosen, Lawrence A. Blatte, Kevin P. Groarke, Rosen & Reade, Irwin H. Warren, Dennis J. Block, Miranda S. Schiller, Weil Gotshal & Manges, New York City, for DWG Corp., Victor Posner, Steven Posner, Melvin R. Colvin, Bernard I. Posner, Russell A. Boyle, Brenda Nestor Castellano, Marco B. Loffredo, Jr., H. Douglas Kingsmore, Martin J. Posner, W.C. Robinson, Patrick O'Neill and T.M. Thompson.

Percy Squire, Michael F. Sullivan, Bricker & Eckler, Columbus, OH, for DWG Corp. Special Committee.

Harold E. Kelley, Ashland, KY, Daniel R. McCarthy, McCarthy Lebit Crystal & Haiman Co., LPA, Cleveland, OH, Richard M. Kerger, Marshall & Melhorn, Toledo, OH, Court–Designated Director of DWG Corporation and member of the DWG Corporation Special Committee.

William L. Pallot, Thomas A. Prendergast, Members of DWG Corp. Special Committee.

Eli Manos, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, for William Pallot, Roger D. Stake and Thomas Prendergast.

## MEMORANDUM OPINION

LAMBROS, Chief Judge.

Corporate governance, the principles of fiduciary responsibility, fiduciary duty and ethical corporate management, are the essence of this case and opinion. This opinion states the rationale for approval and dismissal of the claims in these actions for class, derivative, and declaratory relief and for equitable enforcement of the February 12, 1991 consent decree between Victor Posner, DWG Corporation, and its shareholders.

The 1991 consent decree mandated a democratic process of corporate governance within DWG. The paramount feature of the 1991 consent decree, was the establishment of a control mechanism providing for the presence of court-appointed directors as five year members of DWG's board. This mechanism was established in order to facilitate immediate judicial intervention, in the event Victor

Posner engaged, among other things, in self-dealing, waste, or the siphoning of DWG assets for his personal use. The dismissal of claims that since approval of the 1991 decree, Victor Posner has violated both the terms of the decree and his fiduciary responsibilities, brings to a close a long and arduous saga of litigation against Victor Posner by DWG shareholders and others for corporate mismanagement, waste and self-dealing, while at the helm of DWG. The dismissals also usher in a new and promising beginning for this embattled corporation. This new beginning is marked by what promises to be cooperation between shareholders and management, a massive infusion of capital, and a talented and dynamic new management team with a vision and a plan for growth and development that is committed to maximization of DWG shareholder value.

DWG Corporation is an important component of the national economy. DWG is a holding company; it is at the apex of an intricate web of nearly 150 subsidiaries and several hundred affiliates. DWG provides jobs to 17,000 individuals. One of DWG's subsidiaries, Arby's, has over two thousand franchises and 44,000 employees. Another of its subsidiaries produces RC Cola, Nehi, and other popular soft drinks. DWG's common shares are held by 5,000 investors. The company's stock, roughly 25,000,000 shares, is traded on the American Exchange.

DWG has been engaged in a series of disputes that charge that the corporation is run for the sole personal benefit of Victor Posner, his family, and close associates. *See,* e.g. *In re. Sharon Steel,* 871 F.2d 1217 (3d Cir.1989) and *Joseph. E. Kovacs, et al. v. NVF Co., et al.,* (Delaware Court of Chancery, Civil Action No. 8466), 1987 WL 17042.

By reason of a previous settlement of claims, a court-designated corporate oversight apparatus was established in 1991, to assure discontinuation of a pattern of behavior that had prompted earlier actions against Victor Posner. By reason of that strategic oversight system and court enforcement protocol, the company survived the onslaught of Victor Posner's plunder. The judicial enforcement proceedings staved off the company's demise and provided an opportunity for

the company to hold on long enough for this welcomed changing of the guard.

Since November 14, 1991, the officials designated to serve on DWG's board, have filed DWG Corporation Special Directors' Reports and Recommendations No. 1, 2, and 3, together with a Supplemental Affidavit to Report and Recommendation No. 2, that allege violations of the terms and conditions of the 1991 consent decree. By reason of these reports, proceedings to enforce compliance with the 1991 decree were commenced by the plaintiff Granada Investments, Inc. Company shareholders Irving and Benice Brilliant also filed an "Intervenor Plaintiffs Complaint (Verified)" in the *Granada* enforcement action. As a further result of the Reports of the court-designated directors, Irving Cameon filed a Class Action and Shareholder Derivative Complaint against Victor Posner and the Company's current Board of Directors (other than the court-designated directors). The defendants and Victor Posner commenced an action for declaratory relief with respect to the terms of the 1991 consent decree.

Aggressive confrontations in relation to the issues raised by the parties' claims have been waged by all of the litigants. A detailed procedural history of the evolution of this litigation is summarized as Attachment A to this opinion. The pleadings, memoranda, and documentation mentioned in Attachment A have been considered extensively in connection with the disposition of the parties' requests for settlement approval. *See,* Attachment B, Part 1 for the Order approving the settlement, Part 2 for Judgment and Part 3 for the Order Establishing A Timeline For The Closing Of DWG Corporate Acquisition.

Looking at the Settlement with a sense of proportionality, objectivity and reality against the backdrop of the costs of continued litigation and the rapidly deteriorating economic condition of DWG, it was apparent that the company under the continued direction of Victor Posner would wind up in bankruptcy and its crown jewels, RC Cola and Arby's, would be lost to creditors. Acquisition of control position by the DWG Acquisition Group, L.P., a Delaware limited partnership in which the general partners

are Messrs. Nelson Peltz and Peter May was a *better* option than stripping control from Victor Posner and installing an interim governing body that would have been distracted by the delay of appeals and continued litigation. The change of control contemplated by the transaction proposed by Messrs. Peltz and May, constitutes a remedial equivalent to the relief sought by Plaintiffs in these actions. Accordingly, given the practical effect this change of control will have upon DWG's corporate governance, approval of the settlement was granted and the claims advanced by the parties have been dismissed.

The settlement in this action requires approval of a proposed Modification to the Stipulation of Settlement and Final Order entered in the *Granada* case on February 12, 1991. Under this Modification in return for the dismissal of claims against Victor Posner, he has agreed to relinquish and give up forever, service as Chairman of the DWG Board, as a director, or as an officer of DWG, and is not permitted to exercise any voting control whatsoever over any DWG common stock. Victor Posner has also agreed in return for the dismissal of claims, to accept an 8.9 million dollar reduction in rent that he has alleged is owed to Victor Posner Trust No. 6 by DWG. The Common Cost Center, a vehicle that Plaintiffs alleged Victor Posner used to shift debt from DWG to failing Posner entities, will be terminated under the Modification. Victor Posner has also agreed to refrain from competition with DWG and from the purchase of its stock.

During the evidentiary proceedings in these actions, Victor Posner appeared as a witness. Following over ninety assertions by Posner of his Fifth Amendment privilege against self-incrimination, proceedings were recessed to determine whether the public interest in obtaining testimony from the CEO of a Fortune 500 company, concerning self-dealing, was sufficiently compelling to warrant dismissal of the criminal contempt charges upon which Posner predicated his blanket Fifth Amendment assertion. During this deferral of trial proceedings, Victor Posner indicated that he had an interest in discontinuing enforcement litigation. It was suggested that Victor Posner would relinquish control of DWG, divest himself of substantial interest in DWG and cease service in any capacity with the company. Once Victor Posner complied with these terms and conditions, this litigation would then be dismissed. The undersigned questioned Posner to confirm that he desired a suspension in proceedings to engage in negotiations with Messrs. Nelson Peltz and Peter May, for the sale of his DWG common stock. Victor Posner indicated that he understood that as a condition of dismissal, he would never again be permitted to serve as a DWG officer or director. Given Posner's affirmation that he understood these terms, proceedings were suspended to permit negotiations with Messrs. Peltz and May for the purchase of Victor Posner's controlling stake in DWG.

The negotiation with Messrs. Peltz and May for Victor Posner's interest led to definitive agreements. It has been represented by the parties that these agreements obviate any necessity for further litigation. Accordingly, this change of control transaction, constitutes the basis for the settlement and dismissals of these actions.

Since execution of the definitive agreements to effectuate a change of control in DWG, the market value of the company has soared from 50 million dollars to over 500 million dollars. On April 19, 1993, Fortune Magazine, a respected periodical that documents the performance of major companies, rated DWG as providing the "Highest Total Return to Investors" in 1992. According to Fortune the value of a DWG share has increased 353.8%. The financial community has responded to the proposed change of control by making 400 million dollars in financing available to DWG at competitive rates. These indicators, which are a direct product of the proposed change of control transaction, should be contrasted to findings by Arthur Andersen & Co., DWG's independent auditor, in a report on the consolidated financial statements of DWG for the fiscal year ended April 30, 1992. According to Arthur Andersen, by reason among other things, of litigation expenses and high interest payments, DWG's continuation as a going concern beyond April, 1993, was questionable. The Fortune rating and financing that

has been obtained to effectuate a change of DWG control, are excellent barometers of the value of this change to DWG shareholders. .

The change of control is conditioned on the dismissal of Rule 23 and 23.1 claims against Victor Posner. Clear standards exist for evaluation of the compromise of class and derivative claims.

 In evaluating a compromise under Rule 23, the compromise proposal must be 1) fair, 2) reasonable, and 3) in the best interests of all those who will be affected by it. *See, Williams v. Vukovich,* 720 F.2d 909 (6th Cir.1983). In this connection, the basic test for fairness involves weighing the probability and consequences of success on the merits against the terms of the settlement. *See, Dole,* The Settlement of Class Actions, 71 Col.L.Rev. 971, 1981. A fairness evaluation turns on the facts and circumstances in each case.

 A variety of factors may be taken into account in the evaluation of a Civil Rule 23 settlement. For instance, the class' likelihood of success in the litigation, the points of law on which settlement is based, the amount proposed in settlement compared to what might be recovered during litigation less litigation costs if the action went forward, the sufficiency of notice to class members, and *whether* the settlement waives other viable claims. Due deference should also be given to the recommendation of class counsel and the nature of objections if any.

A similar, but somewhat different standard applies to Rule 23.1 settlements.

 In the case of a Rule 23.1 settlement, as I outlined in my February 12, 1991 Order:

Rule 23.1 of the Federal Rules of Civil Procedure provides that the authority to approve a settlement of a derivative action is committed to the sound discretion of the trial court. *Jones v. Nuclear Pharmacy, Inc.,* 741 F.2d 322, 324 (10th Cir.1984);

West Virginia v. Chas Pfizer & Co., 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd* 440 F.2d 1079, 1085 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). In exercising its discretion, a Court should not decide the merits of an action or attempt to substitute its own judgment for that of the parties. *Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983); *Lewis v. Newman,* 59 F.R.D. 525, 527 (S.D.N.Y.1973). Rather a Court must determine that the settlement agreement is fair, reasonable, and adequate. *Williams* [*v. Vukovich* ], 720 F.2d at 909 [ (6th Cir.1983) ]; *Bronson v. Board of Education of City School District of the City of Cincinnati,* 604 F.Supp. 68, 73 (S.D.Ohio 1984); *Maher,* 714 F.2d at 455.

In deciding whether a settlement is fair, reasonable, and adequate, a Court should consider the following factors:

(1) whether the proposed settlement was fairly and honestly negotiated;

(2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; [1]

(4) the complexity, expense, and likely duration of the litigation;

(5) when significant discovery has been completed, the Court must consider and should defer to the judgment of experienced trial counsel who competently evaluated the strength of his proofs;

(6) the judgment of the parties that the settlement is fair and reasonable;

(7) the objections raised by shareholders of the defendant corporation, but not to withhold approval merely because some shareholders object to it; and

(8) the number of objectors to the settlement.

---

1. The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. *In re General Tire & Rubber Co. Sec. Litigation,* 726 F.2d 1075, 1086 (6th Cir.1984); *Newman v. Stein,* 464 F.2d 689, 692 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The likelihood of success, in turn provides a gauge from which the benefits of the settlement must be measured. *In re General Tire,* 726 F.2d at 1086; *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

*Williams,* 720 F.2d at 921–24; *In Re General Tire & Rubber Co. Securities Litigation,* 726 F.2d 1075, 1080 (6th Cir.1984); *Thompson v. Midwest Foundation Independent Physicians Association,* 124 F.R.D. 154, 157 (S.D.Ohio 1988); *Bronson,* 604 F.Supp. at 73–74; *Jones,* 741 F.2d at 324.

The proponents of the settlement have the burden of persuading the Court that the compromise is fair, reasonable and adequate. *In re General Tire,* 726 F.2d at 1080. With the Court's preliminary approval of the stipulation, the proponents satisfy this burden and the settlement is presumptively reasonable. *Williams,* 720 F.2d at 921; *Stotts v. Memphis Fire Department,* 679 F.2d 541, 551 (6th Cir.1982), *cert. granted,* 462 U.S. 1105, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1013 (7th Cir.1980); *United States v. City of Miami,* 614 F.2d 1322, 1333 (5th Cir.1980). The burden then shifts to the objecting shareholders who have a heavy burden of demonstrating that the decree is unreasonable. *See Williams,* 720 F.2d at 921; *Stotts,* 679 F.2d at 551; *Village of Arlington Heights,* 616 F.2d at 1014.

*Granada Investments, Inc. v. DWG Corporation,* United States District Court, N.D. Ohio Civil Action 1:89 CV0641, February 12, 1991 at 10, 1991 WL 338233.

The settlement in these actions is the product of arms-length negotiations. Negotiations were monitored by the court-designated directors. If Plaintiffs had succeeded on the merits, the relief sought by Plaintiffs is substantially approximated by the outcome that will result from the change of control transaction.

Notice of the proposed settlement was mailed to all DWG shareholders. In addition, summary notice was published in the national edition of the *Wall Street Journal* and *Cleveland Plain Dealer.* A Fairness Hearing was conducted on March 22, 1993. No objections to the settlement were filed and no shareholder appeared at the Fairness Hearing to challenge the Settlement. All parties to the litigation have requested approval.

Settlement here provides a remedial equivalent to the relief sought. This fact coupled with the favorable market and financial community reaction to the underlying transaction, both work in favor of approval, particularly given the fact that the new control group is able to infuse new capital into DWG at very competitive rates, whereas Victor Posner could only obtain financing at exorbitant interest rates. Accordingly, on these bases, the recommendations of counsel for all parties, and the absence of objections, Settlement approval was granted, with the expectation that DWG will be managed fairly.

Corporate management is largely a function of the exercise of business judgment on behalf of shareholders. An implicit aspect of performance of this purely economic duty is denoted by the following corollary: Fair, principled, and honest behavior and the obligation to maximize value for every shareholder, are ethical responsibilities. Depressing shareholder values, the reaping of personal benefits that are the equivalent of dividends without sharing, and the draining of profits that should benefit everyone, is antithetic to the business judgment concept.

The business judgment rule "presumes that in making a business decision, actions have been taken on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the company." Knepper & Bailey, § 1.02 at 4. This rule was intended for those who act reasonably and is not protection against self-dealing and avarice.

There are two primary reasons for the business judgment rule. First, courts employ the business judgment rule because "in order for a corporation to be managed properly and efficiently, latitude must be given in the handling of corporate affairs." *Id.,* at § 1.13. There are major policy grounds for the granting of this latitude:

a. If management were liable for mere good faith errors in judgment, few capable individuals would be willing to incur the financial and emotional risk of serving as a director or officer. Competent

persons should be encouraged rather than deterred from seeking to serve as corporate managers.

b. Courts are generally ill-equipped to evaluate business judgments or to second guess the validity of a business decision.

c. Corporate managers should be encouraged to efficiently manage the corporation by taking reasonable risks and by being allowed wide discretion in the handling of corporate affairs.

*Id. See also, Panter v. Marshall Field & Co.,* 646 F.2d 271, 297 (7th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Cramer v. General Telephone & Elec. Corp.,* 582 F.2d 259, 274 (3d Cir.1978); Knepper & Bailey, § 6.03 at 182–184. This does not mean unbridled nor unrestricted discretion. Integrity and honesty are the bridles and restraints.

The policy behind not permitting courts to review business decisions is best stated in the case of *Joy v. North,* 692 F.2d 880, 866 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983) as being:

[C]ourts recognize that after-the-fact litigation is a most imperfect device to evaluate corporate business decisions. The circumstances surrounding a corporate decision are not easily reconstructed in a courtroom years later, since business imperatives often call for quick decisions, inevitably based on less than perfect information. The entrepreneur's function is to encounter risks and to confront uncertainty, and a reasoned decision at the time made may seem a wild hunch viewed years later against a background of perfect knowledge.

Additionally, the Seventh Circuit has noted that "[m]anagers who make such judgment calls poorly ultimately give way to superior executives; no such mechanism 'selects out' judges who try to make business decisions. In the long run firms are better off when business decisions are made by business specialists, even granting the inevitable errors." *Kamen v. Kemper Financial Services, Inc.,* 1990 Fed.Sec.L.Rep. (CCH) ¶ 95,363, 96,766 (7th Cir.1980).

A second reason for the business judgment rule is the view that the shareholders voluntarily undertake the risks of bad business judgments and, absent some breach of duties or inherent unfairness, should bear the risk of such decisions. *Joy,* 692 F.2d at 882. Specifically, the Second Circuit in *Joy* noted that the profit potential inherent in investment in corporate stocks responds to the potential risk, "so it is in the interests of the shareholder that the law avoids creating incentives for overly cautious corporate decisions." *Id.*

In *Levandusky v. One Fifth Avenue Apartment Corp.,* 75 N.Y.2d 530, 537–38, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990) (citations omitted), the New York Court of Appeals described the effect of the business judgment rule as follows:

Developed in the context of commercial enterprises, the business judgment rule prohibits judicial inquiry into actions of corporate directors "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." So long as the corporation's directors have not breached their fiduciary obligation to the corporation, "the exercise of [their powers] for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient."

*See also,* Knepper & Bailey, § 1.13 at 31–33.

A second effect of the business judgment rule is to ensure that the directors, and not the shareholders, manage the corporation, as is required by state statutes.

The power to hold to account is the power to interfere and, ultimately, the power to decide. If stockholders are given too easy access to courts, the effect is to transfer decision making power from the board to the stockholders or, more realistically, to one or a few stockholders whose interests may not coincide with those of the larger body of stockholders. By limiting judicial review of board decisions, the business judgment rule preserves the statutory scheme of centralizing authority in the board of directors. In doing so, it also preserves the value of centralized decision

making for the stockholders and protects them against unwarranted interference in that process by one of their number. Although it is customary to think of the business judgment rule as protecting directors from stockholders, it ultimately serves the more important function of protecting stockholders from themselves.

Dooley & Veasey, "The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared," 44 Bus. Law. 503, 522 (1989).

■ However, while the presumption is that directors are entitled to the shield of the business judgment rule, there are preconditions to its use. If a shareholder establishes one or more of these preconditions are lacking, the director may not avail him or herself of the benefit of the rule. These preconditions are:

d. a business decision;

e. the absence of a personal interest in the transaction and an absence of self-dealing;

f. the exercise of due care in making the business decision, or evidence of an informed decision with a reasonable effort to become familiar with the relevant and available facts;

g. no evidence of abuse of discretion, or a reasonable belief that the best interests of the corporation and shareholders will be served by the business decision; and

h. good faith.

Knepper & Bailey, § 1.13 at 31-33.

■ Where there is evidence that a director has a personal interest in the transaction, the director will be required to show that the transaction was fair and reasonable to the corporation notwithstanding his or her personal interest. *Id.* When directors lose the protection of the business judgment rule, a court may inquire into the fairness of the decision and whether the directors discharged their fiduciary duties to the shareholders in making the challenged decision.

A director who believes the business judgment rule provides unlimited and unfettered discretion to pillage the investment of others for personal gain, places false hope in this concept.

Claims by DWG shareholders with regard to the abuses wrought by Victor Posner, are a result of the classic situation that, other than Victor Posner and his affiliates, the common stock of DWG is dispersed among numerous minority shareholders who are completely separated from DWG management. Without significant coordination, financing, and effort, these shareholders are unable to exert control over the management of the funds they have invested in DWG.

The potential for abuse by reason of the separation of share ownership and control in large, public corporations has led one commentator to note:

[M]anagement, not shareholders, controls the modern large corporation: the dispersal of share ownership has allowed management to exploit its control of information about the corporation and the corporations' operations, including the proxy mechanism, to elect themselves or sympathetic outsiders to the board of directors. Naturally reluctant to share its authority, management has minimized the board's participation in corporate governance, and the board of directors has [the potential to be] reduced to an 'impotent ceremonial and legal fiction.'

Solomon, "Restructuring the Corporate Board of Directors: Fond Hope—Faint Promise?" 76 Mich.L.Rev. 581 (March 1978). The separation of control from share ownership coupled with a board that will not assert itself, was the gravamen of this action.

Concerns regarding the detrimental effect to shareholders' rights and the securities markets resulting from this separation of share ownership and control, have spawned many efforts in the state legislatures, Congress and in courts to regulate corporate governance.

The important law shaping factors in recent decades have in fact been dispersion of ownership among great masses of stockholders—who clearly do not control regardless of who does—and the size of modern corporate entities.

Loss & Seligman, *Securities Regulation*, Vol. 1 at 23.

This issue, identified as early as 1932 by Berle & Means in their landmark work entitled *The Modern Corporation and Private Property*, was one of the factors underlying the enactment of the federal securities acts.

The extent of the problem, however, has not lessened but, instead, has grown in recent decades due to the increase in the number of persons holding shares in public companies. Studies conducted for the New York Stock Exchange ("NYSE") estimated that in 1990, 51.44 million persons, or one in every five persons, in the United States held stock in American public corporations, either directly or through mutual funds. *Id.*, at 13–14. Additionally, NYSE estimates from 1980 indicate that at least 133 million persons directly owned stock in public corporations through pension plans, life insurance or other intermediaries. *Id.*

As a result, the drive on the part of state and federal governments and on the courts to ensure the proper balance in corporate governance has not subsided, there has been a consistent effort, particularly in recent decades, to adopt additional laws to regulate corporate governance. *See, e.g.,* Goldstein, "Future Articulation of Corporation Law," 39 Bus.Law. 1541 (Aug.1984); Matheson & Olson, "Corporate Law and the Long Term Shareholder Model of Corporate Governance," 76 Minn.L.Rev. 1313 (June 1992); Andre, "The Corporate Governance Reform Act of 1995," 17 J.Corp.L. 87 (Fall 1991).

At several points, most recently in the 1970's, Congress has conducted investigations into corporate governance. The result of investigations in the 1970's into wrongdoing by corporate managers of questionable payments for foreign government officials, of which the directors were ignorant, was the Foreign Corrupt Practices Act of 1977 and in the addition of NYSE rule requiring that all listed companies maintain an audit committee of the board of directors. Loss & Seligman, at 24–25. Currently, the American Law Institute is involved in the Principles of Corporate Governance and Analysis Recommendation Project. *Id.* Moreover, legislation, although not yet acted upon, has been submitted to Congress setting forth certain minimum requirements for corporate governance.

*See* Protection of Shareholders Rights Act of 1980, S.R. No. 2567, 96th Cong., 2d Sess. (1980); Corporate Democracy Act of 1980, H.R. 7010, 96th Cong., 2d Sess. (1980).

Given the historical development and importance of corporations and the potential for abuse of shareholder trust, the assurance of effective corporate governance is essential to settlement of shareholder class and derivative claims. The settlement proposed here, by virtue of its various Victor Posner preclusions and continued role for court-designated directors, provides safeguards for DWG shareholders against a recurrence of the claims at issue.

The Reports filed in these actions by the court-designated directors, state that Victor Posner's judgment on behalf of shareholders, resulted in the demise of Sharon Steel Corporation, Pennsylvania Engineering Corporation, and others, and has brought NVF Company and APL to the brink of financial ruin. The trends depicted in the Reports of the court-designated directors and Arthur Andersen's 1992 Audit, indicate that, but for the intervention of these actions, DWG was destined for a similar fate. The imposition of a corporate governance protocol and the thrusting of a watchdog committee upon the management of DWG, interrupted an alleged otherwise uninhibited disregard for ethical corporate governance and shareholder interests. The settlement embodied within the Modification, will eliminate Victor Posner's control over DWG management decisions, and will thus satisfy the objectives of plaintiffs' actions.

To fully appreciate the contemporary posture of proper corporate governance, one needs to review the treatment of this topic in American jurisprudence. The idea of free incorporation did not become established in America until the United States Supreme Court articulated the doctrine that a corporation, instead of having the right to do all things that a natural person could do, had such powers only as were expressly granted to it by its enabling act. See *Head v. Providence Ins. Co.*, 6 U.S. (2 Cranch) 127, 2 L.Ed. 229 (1804). With this principle established, a vast territory opened for commercial development. Private business corporations mul-

tiplied rapidly in number and importance. 1 Fletcher Cyclopedia Corporations § 2, at 7.

In an elaborate dissenting opinion in *Louis K. Liggett Co. v. Lee* (1932), 288 U.S. 517, 53 S.Ct. 481, 77 L.Ed. 929, Justice Brandeis recounted the history of the evolution of state corporation laws and pointed out the many restrictions formerly imposed upon the creation of corporations. These restrictions were due to an attitude of suspicion and fear toward the corporate mechanism. As Justice Brandeis said:

> There was a sense of some insidious menace inherent in large aggregations of capital, particularly when held by corporations. So at first the corporate privilege was granted sparingly.... The later enactment of general corporation laws does not signify that the apprehension of corporate domination had been overcome.... The general laws, which long embodied severe restrictions upon size and upon the scope of corporate activity, were, in part, an expression of the desire for equality in opportunity.
>
> *Limitation upon the amount of the authorized capital* of business corporations was long universal. The maximum limit frequently varied with the kinds of business to be carried on....
>
> Limitations upon the scope of a business corporation's powers were also long universal. At first, corporations could be formed under the general laws only for a limited number of purposes—usually those which required a relatively large fixed capital, like transportation, banking, and insurance, and mechanical, mining, and manufacturing enterprises. Permission to incorporate for 'any lawful purpose' was not common until 1875; and until that time the duration of corporate franchises was generally limited to a period of 20, 30, or 50 years. All, or a majority, of the incorporators or directors, or both, were required to be residents of the incorporating state. The powers which the corporation might exercise in carrying out its purposes were sparingly conferred and strictly construed. Severe limitations were imposed on the amount of indebtedness, bonded or otherwise. The power to hold stock in other corporations was not conferred or implied. The holding company was impossible.
>
> The removal by leading industrial states of the limitations upon the size and powers of business corporations appears to have been due, not to their conviction that maintenance of the restrictions was undesirable in itself, but to the conviction that it was futile to insist upon them; because local restriction would be circumvented by foreign incorporation.

*Id.* at 549–557, 53 S.Ct. at 490–493.

Justice Brandeis characterized the early purpose of private business corporations as primarily public:

> Whether the corporate privilege shall be granted or withheld is always a matter of state policy. If granted, the privilege is conferred *in order to achieve an end which* the State deems desirable. It may be granted as a means of raising revenue; or in order to procure for the community a public utility, a bank, or a desired industry not otherwise obtainable; or the reason for granting it may be to promote more generally the public welfare by providing an instrumentality of business which will facilitate the establishment and conduct of new and large enterprises deemed of public benefit. Similarly, if the privilege is denied, it is denied because incidents of like corporate enterprise are deemed inimical to the public welfare and it is desired to protect the community from apprehended harm.

*Id.* at 545, 53 S.Ct. at 488.

Similarly, in his discussion of the early history of business corporations, Professor Williston refers to the public purpose of corporations; he referred to an early commentator who stated that "[t]he general intent and end of all civil incorporations is for better government." 3 Williston, Select Essays on the Anglo–American Legal History 201 (1909) [hereinafter Williston]; see also W.L. Cary & M.A. Eisenberg, Corporations 117 (6th ed. 1988). Williston points out that the early corporate charters, particularly their recitals, furnish additional support for the notion that the corporate object was the public one of managing and ordering the trade as well as the private one of profit for the

members of the corporation. Williston at 201; see also *Currie's Administrators v. The Mutual Assurance Society*, 4 Hen. & M. 315, 347 (Va.Sup.Ct.App.1809) (referring to the English corporate charters and expressing the view that acts of incorporation ought never to be passed "but in consideration of services to be rendered to the public"). However, with later economic and social developments, and the free availability of the corporate mechanism for all trades, the end of private profit became generally accepted as the controlling one in all businesses other than those classed broadly as public utilities. Cary & Eisenberg at 117.

One commentator has noted that, at an early stage of development, the corporation became the focus of animosity because of problems encountered by the individual in the free market system. Elliott Goldstein, *Future Articulation of Corporation Law*, 39 The Business Lawyer 1541, 1542 (1984). For instance, farmers felt that low prices for their goods, in contrast to higher prices for manufactured goods, were caused by machinations of business trusts. Goldstein at 1542. Small merchants and laborers opposed the growth of "soulless corporations." *Id.* Consequently, as corporations grew in size and influence, the notion that there should be government regulation of corporations was accepted.

As corporations developed and grew, a central principle of corporate law emerged: the sole duty of a corporation's officers is to maximize shareholder wealth. Daniel H. Pink, *The Valdez Principles: Is What's Good for America Good for General Motors?*, 8 Yale L. & Policy Review 180 (1990). As time passed, calls rose for corporations to be more socially responsible, nonetheless, the principle that a corporate officer's overriding duty is to maximize shareholder wealth remains intact. *Id.*, at 181. Today, this appears to be the dominating goal of corporations in a free market society. Accordingly, where claims have been proved that shareholder rights have been ignored, prospects for court-imposed governance are ripe.

▮▮▮▮ Under Ohio law, where allegations like those in this case have validity, a court should intervene in corporate governance when the facts reveal that the acts of officers or directors of a corporation constitute (1) gross mismanagement of the business of the corporation; or (2) misapplication of corporate assets to the injury of its stockholders or creditors. *See, e.g., Phoenix Portland Cement Co. v. Shadrach*, 18 Ohio App. 264, 267–69, 2 Abs 124 (Franklin County 1924). A court should also intervene in equity to preserve assets pending litigation. The *Phoenix Portland Cement Co.* court explained a court's right to intervene in equity as follows:

It may further be said that this court has never denied power in a chancellor to prevent a scheme of irreparable injury and wrong, merely because movers in that scheme speak and act in a corporate capacity rather than in an individual capacity. That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are 'frozen out,' that business immorality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of directors of a corporation are but trustees of an estate for all stockholders and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them, when, by fraud, conspiracy, or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate *entente cordiale* is unfairly destroyed. It would be a sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality towards one of its conflicting parties, or has put the estate in a fix it is liable and likely to be either wasted or destroyed, or mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate. We have never so declared the law.

*Id.* 18 Ohio App. at 267–68 (quoting *Cantwell v. Columbia Lead Co.*, 199 Mo. 1, 42, 97 S.W. 167).

■ Under Ohio law, equitable receivers have been appointed upon a demonstration of gross mismanagement or mismanagement of the assets of a corporation to the detriment of the shareholders, as well as to preserve the assets of a corporation pending litigation.[2] *See Phoenix Portland Cement Co. v. Shadrach,* 18 Ohio App. 264 (Franklin County 1924) (preferred non-voting stockholders of a subsidiary corporation, in an action of accounting against the dominant and controlling corporation, are entitled to have a receiver appointed, upon the ground of mismanagement and wasting of assets of the subsidiary corporation, when reasonably necessary to protect the interests of such stockholders, although the corporation is solvent as to creditors); *National Salt Co. v. United Salt Co.,* 11 Ohio Dec. 348 (Cuyahoga Common Pleas 1901) (receiver may be appointed for a corporation to preserve assets pending litigation); *Birch v. Stacey,* 29 Ohio N.P. (N.S.) 1 (Hamilton Common Pleas 1931) (appointment of a receiver and granting of injunction are appropriate where one corporation controls another and is alleged to be using its control in its own interest); *Guardian Financing Co. v. Davidson,* 23 Ohio App. 143, 145, 147–49 (Summit County 1924) (not appointing receiver, but recognizing that an Ohio court has authority to appoint a receiver for a corporation in a proper case according to the "usages of equity," including where there are allegations of misconduct by present directors, past wrongdoing by the president, or the assets and property of the corporation are being dissipated and fraudulently

absorbed and it is necessary for the court to preserve and rightly apply the assets of the corporation; even in these cases, appointment of a receiver will be a remedy of last resort); *see also generally* Ohio Jurisprudence 3d Receivers, §§ 24, 26–27, 41.[3]

■ A receiver may also be appointed to carry a judgment into effect. *See State, ex rel. Celebrezze v. Gibbs,* 60 Ohio St.3d 69, 573 N.E.2d 62 (1991).

The foregoing review of corporate law and principles that govern the fiduciary responsibilities of those that run corporations, causes me to focus on the facts and circumstances surrounding this case and the applicability of these legal principles to the conditions before us. This review enables me to express the rationale for approval of the Settlement. I am hopeful it will assist others that are concerned to a better understanding of the resolution. This case presents a complex and inextricably interwoven set of circumstances and the blending of corporate law and securities regulations. This blending necessitated judicial management fashioned to coordinate judicial resolution with required securities regulatory clearances.

The federal securities laws of the United States[4], all administered by the Securities and Exchange Commission (the "SEC"), were enacted as a means to reduce management abuses of the nature alleged in this action. The two acts principally addressing issues of protection of the investing public are the Securities Act of 1933 (the "1933

2. Ohio statutory and common law permit appointment of a receiver, *inter alia,* in the following instances:

(1) "[a]fter judgment, to carry the judgment into effect," *see* R.C. 2735.01(C); *see also State, ex rel. Celebrezze v. Gibbs,* 60 Ohio St.3d 69, 573 N.E.2d 62 (1991);

(2) "[w]hen a corporation ... is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights," *see* R.C. 2735.01(E); and

(3) "[i]n all other cases in which receivers have been appointed by the usages of equity," *see* R.C. 2735.01(F).

Receivership, however, is an extraordinary remedy that is to be used only as a matter of last resort.

3. In *Hoiles v. Watkins,* 117 Ohio St. 165, 157 N.E. 557 (1927), however, the Ohio Supreme

Court held that a receiver may *not* be appointed for a corporation if (1) receivership is the ultimate, not ancillary, relief sought; (2) no creditor of the company is a party to the action; (3) no judgment has been taken or levied against any of the assets of the corporation; and (4) there is no need for appointment of a receiver on the facts of the case. The *Hoiles* case, however, does not preclude appointment of an equitable receiver in appropriate cases and also does not preclude use of equitable remedies short of appointment of a receiver.

4. In addition to the 1933 and 1934 Acts, these are the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the Securities Investor Protection Act of 1970.

Act") and the Securities Exchange Act of 1934 (the "1934 Act"). In general, the 1933 Act deals with original issuance of securities, while the 1934 Act provides protection for investors once the securities are issued.

The authority for Congress to pass the federal securities laws can be found in the "interstate commerce" clause in ʻArticle 1, § 8 of the United States Constitution. The federal securities laws grew out of, among other things, several decades of attempts by the states to address abuses and problems in the raising of capital and abuses by managements in how they treated their investors. Additional background for the federal securities laws involved the states systems of corporate laws.

While the societal developments giving rise to the problems sought to be addressed by the states are not fully relevant here, suffice it to say that these problems arose with the separation of share ownership from control. Those who had an equity interest in businesses were not active in their operation, rather the businesses were being run by their managements. It was not the intent of the federal securities laws to reverse this trend. In fact, management control only increased after the enactment of these acts.[5] In addition, the numbers of investors in publicly traded companies has steadily increased, so more and more of the public are investing in businesses and these investors are taking

advantage of the protections afforded by the securities laws.[6]

One collateral aspect of the divorce of ownership from control was the "dummy director" who just showed up for a free meal and a fee.[7] As more and more owners of businesses were not involved in the running of those businesses, those who actually ran the businesses failed to furnish essential information to the owner-shareholders.[8] This disclosure problem is a primary focus of the federal securities laws.

Since, under the American constitutional, statutory and regulatory scheme, corporations are creatures of state law, the federal government has traditionally had only a limited interest in corporate affairs. However, the interstate commerce clause of the U.S. Constitution and federal securities laws have imposed increased responsibility on judges. Several courts have examined the relationship between state and federal law in this area.

Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.[9] Without a clear indication of Congressional intent, courts have been reluctant to "federalize" the substantive portion of corporate law, especially where settled policies of state law would be nullified.[10]

---

**5.** Berle and Means studied 200 nonfinancial institutions in 1932, and Larner conducted a follow-up study in the 1960's. The institutions were classified based on the types of corporate control. In 1929, 44% were under management control, but in 1963, 84.5% were under management control. A. Berle & G. Means, The Modern Corporation and Private Property, 94 (1932). Larner, Ownership and Control in the 200 Largest Nonfinancial Corporations, 1929 and 1963, 56 Am.Econ.Rev. 777 (1960).

**6.** In 1985, the New York Stock Exchange estimated that there were 47 million shareholders in publicly owned corporations and mutual funds. This was 20.1% of the population. N.Y. Stock Exch., Shareownership 1985 (1986). The growth has been particularly rapid since post-World War II. It should also be kept in mind that these numbers do not include those making indirect investments as participants in pension plans.

**7.** Loss & Seligman, Securities Regulation, 3d Ed. 23 (1989), citing Douglas, Directors Who Do Not Direct, 47 Harv.L.Rev. 1305 (1934). Cf. Testimony of Harold E. kelley concerning DWG's "AMEN" directors, in Granada v. DWG Corporation Transcript of February 28, 1992 hearing at 331.

**8.** Loss & Seligman, 25. H.R.Rep. No. 85, 73d Cong., 1st Sess. 2–3 (1933).

**9.** Cort v. Ash, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975), as quoted in Karmel, Is It Time for a Federal Corporation Law?, 57 Brook.L.Rev. 55, n. 122.

**10.** See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977), where the Court refused to apply the Rule 10b–5 anti-fraud standard to an alleged breach of corporate fiduciary duty.

The proxy rules are the principal means by which the SEC can and does have an effect on corporate governance, typically the province of the law of the state of incorporation. The language of §. 14(a) of the 1934 Act and the proxy rules promulgated thereunder gives the SEC considerably more general powers than that provided under the specific disclosure philosophy of the 1933 Act.[11] In several situations, the SEC has attempted to step into corporate governance territory, and Congress, too, has considered and enacted some legislation that would or does impinge on the corporation laws of the states.[12] The perceived abuses by corporations have prompted these legislative actions and calls by commentators for further action, even to the point of requiring federal incorporation for certain types of corporations.[13]

One issue that has been the focus of a significant amount of literature has been voting rights, whether each share of common stock is entitled to one vote. The American Stock Exchange has never required listed common securities to follow the one share/one vote axiom. The New York Stock Exchange only recently allowed shares with disparate voting rights to be listed.[14] It has been argued that the SEC, with its powers to regulate the securities exchanges under

§ 19(c) of the 1934 Act, has the power to adopt a rule forbidding firms whose stock is traded on a national securities exchange from issuing common stock with unequal voting rights.[15]

As argued by Seligman, in his 1986 article, the legislative history of the Exchange Act indicates that the SEC's actions must be "consistent with objectives of the Exchange Act." [16] Requiring all shares to have equal voting rights would be "consistent with objectives of the Exchange Act" for three reasons. (a) The SEC may designate, under § 11A(a)(2) of the 1934 Act, the securities "qualified for trading." (To qualify, the securities could be required to meet certain voting requirements.) (b) Under the Williams Act, in the tender offer context, the SEC may be empowered to require exchange rules to meet the Williams Act goal of neutrality between contestants. (c) The purpose of the proxy provisions of § 14(a) of the 1934 Act is to protect "the free exercise of the voting rights of stockholders." [17]

In response to the New York Stock Exchange's filing of its dual classification rule change, the SEC refused to allow the rule and, instead, promulgated Rule 19c–4. That

**11.** See Seligman, Equal Protection in Shareholder Voting Rights: The One Common Share, One Vote Controversy, 54 Geo.Wash.L.Rev. 687, n. 139, citing 2 L. Loss, Securities Regulation 868 (2d ed. 1961).

**12.** Some examples of these include the 1970's scandal of corporations paying bribes to foreign governmental officials, which prompted Congress to investigate and to enact the Foreign Corrupt Practices Act of 1977. Congress has conducted other investigations and considered imposing some requirements. Two such proposals were the Protection of Shareholder Rights and the Corporate Democracy bills introduced in the early 1980's.

**13.** See Seligman, The Case for Federal Minimum Corporate Law Standards, 49 Md.L.Rev. 947 (1990); and Karmel, *supra* at n. 9.

**14.** New York Stock Exchange, New York Stock Exchange Directors Approve Amendment to Allow Dual Classes of Common Stock for Listed Companies (July 3, 1986); Sterngold, Big Board Ends Equal Vote Rule, N.Y. Times, July 4, 1986, at D1, col. 1.

**15.** Seligman, *supra* at n. 11 [GWLR], nn. 117–143.

**16.** Staff of Senate Comm. on Banking, Housing and Urban Affairs, 94th Cong., 1st Sess., Summary of Principal Provisions of Securities Acts Amendments of 1975, at 8 (Comm.Print 1975).

**17.** *J.I. Case Co. v. Borak*, 377 U.S. 426, 431–32, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Both the House and Senate committee reports on the 1934 Act indicate that the purpose of section 14 was "to [prevent] the recurrence of abuses which have frustrated the free exercise of voting rights of shareholders." In a similar vein, the House Committee Report stated:

Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.... Inasmuch as only the exchanges make it possible for securities to be widely distributed among the investing public, it follows as a corollary that the use of the exchanges should involve a corresponding duty of according to shareholders fair suffrage.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13–14 (1934); see also S.Rep. No. 792, 73d Cong., 2d Sess. 12, 77 (1934).

rule prohibited all exchanges from listing the stock of any corporation that takes any action to nullify, restrict or disparately reduce the per share voting rights of common stockholders.[18] However, the U.S. Court of Appeals for the D.C. Circuit, in *The Business Roundtable v. SEC*[19] invalidated this rule on the grounds that it was *not* in furtherance of any purpose of the 1934 Act and impinged severely on the tradition of state regulation of corporate law. Some legislation has been considered, but as a result of the *Business Roundtable* case, the prospect for federal legislation now appears dim.

Another area of corporate governance where the federal securities laws have played a role, and where commentators and shareholder groups have encouraged the SEC and Congress to do more, relates to anti-takeover legislation. In the past two decades, there has been a wave of state anti-takeover litigation and legislation.[20] In 1977, the SEC announced that it would hold "public hearings concerning shareholder communications, shareholder participation in the corporate electoral process, and more generally, corporate governance."[21] This arose out of questionable and illegal activities of firms. The focus here was to be possible legislation on federal chartering of corporations, setting minimum standards of conduct, and management accountability, all by revisions to the proxy rules. There was a call for, among other things, more truly independent directors.

The discussion and proposals referred to above, manifest widespread recognition of the importance and need for strong, clear national policies concerning ethical corporate governance and management.

The settlement in this action is expected to produce a dramatic change in the manner in which DWG is governed and in the composition of its Board of Directors. In this connection, the tenure as board members of the court-designated directors, has been extended for five years from the date of closing the underlying financial transaction. Moreover, as a part of the settlement, Messrs. Peltz and May have filed an Undertaking in the *Granada* action in which they consent, among other things, to continuing jurisdiction to enforce the Modification and to never vote shares they control to elect Victor Posner or members of his family to the DWG board.

Approval of the settlement contained within the Modification is inexorably linked to the voluntary and permanent departure of Victor Posner from control of DWG. The transaction that will lead to Victor Posner's departure has been described to shareholders in proxy materials reviewed and cleared by the SEC. DWG shareholders have approved the requisite measures to effectuate the transaction. All actions required to be taken by the DWG Board have also taken place.

The litigation in this action had accumulated considerable momentum. Although a strong factual basis had been advanced regarding Victor Posner's corporate transgressions, it is unknown, following a full and fair evaluation of the evidence, which of the parties would have prevailed. And, although courts should exercise restraint in connection with the ordering of corporate governance related remedies, where a death grip has been secured over the affairs of a corporation by reason of a hand-picked board of directors' virtual zombie-like obedience to the whims and avarice of a single individual, the availability of a control mechanism, similar to that established by the 1991 consent decree or embodied in the present Modification, is a preferable alternative for shareholders than continued litigation. The change of control, proposed by the parties to secure the dismissal of claims, clearly offers greater benefits to DWG shareholders than continued prosecution of claims against Victor Posner for deficient management and wrongdoing. An apt analogy for this perspective is presented by the comparative ease with which a

**18.** Sec. Ex. Act Rel. No. 16,888 (June 11, 1980).

**19.** 905 F.2d 406 (D.C.Cir.1990).

**20.** Karmel, *supra* at n. 9, at nn. 6–10.

**21.** Reexamination of Rules Relating to Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally, Sec. Ex. Act Rel. No. 13,482 (Apr. 28, 1977), 42 Fed.Reg. 23,901, 23,902 (1977).

malignancy may be extricated from an organism and destroyed, only to discover that the process to achieve removal of the malignancy has resulted in the organism's demise.

■ Finally, given my sense of proportionality, objectivity, and reality in relation to the financial health of DWG, the costs of continued litigation, and the availability of an attractive remedial equivalent, I have concluded that the interests of DWG shareholders are better served by the approval of the Settlement and the dismissal of all claims, than by costly and protracted efforts toward a court-imposed solution.

**IT IS SO ORDERED.**

## ATTACHMENT A

### PROCEDURAL HISTORY

On April 10, 1989, Plaintiff Granada Investments, Inc. ("Granada"), suing individually and derivatively on behalf of and in the right of the shareholders of DWG Corporation ("DWG"), an Ohio corporation, filed a Verified Complaint For Declaratory And Injunctive Relief (the "Complaint"), against DWG and the following Named Defendants: Victor Posner, Steven Posner, Melvin R. Colvin, Bernard I. Posner, Russell A. Boyle, Jack Coppersmith, Marco B. Loffredo, Jr., William L. Pallot, Leonard H. Roberts, H. Douglas Kingsmore, Martin J. Posner, Thomas A. Prendergast, and Roger D. Stake (hereinafter collectively referred to as "DWG"). Granada, whose main business activity is investing in securities, is a Delaware corporation, with its principal place of business in New York. Granada is the beneficial owner of in excess of 5% of DWG's issued and outstanding stock. Defendant DWG is a publicly held corporation with its principal place of business in Miami, Florida, and is engaged in a diverse range of businesses through numerous subsidiaries and affiliates. DWG has a long history as a troubled company.

In the Complaint, Granada asserted a claim against all Defendant-directors of DWG for breach of fiduciary duties of care, loyalty, trust and fair dealing, a claim against Victor Posner, as the dominant shareholder, for breach of special fiduciary duties, and a claim against all Defendant-directors of DWG for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and the rules and regulations promulgated by the Securities and Exchange Commission ("SEC") thereunder.

On April 19, 1989, Granada filed a Verified First Amended Complaint For Declaratory and Injunctive Relief (the "First Amended Complaint") against the same Defendants, except Brenda Nestor Castellano, a director of DWG, was substituted for Jack Coppersmith who was not a director of DWG. In the First Amended Complaint, Granada realleged the claims asserted in the original Complaint.

On June 9, 1989, Granada filed a Verified Second Amended and Supplemental Complaint for Declaratory and Injunctive Relief (the "Second Amended Complaint") against the same Named Defendants, after two (2) months of expedited discovery. In the Second Amended Complaint, Granada realleged the claims previously asserted, and, additionally, asserted new claims against Victor Posner seeking the imposition of a constructive trust for the benefit of DWG and its other shareholders, and for violation of the Ohio Control Share Acquisition Act, Ohio Rev. Code § 1701.8313 in connection with his alleged improper acquisition of DWG shares.

On June 29, 1989, DWG filed a Counterclaim and Third–Party Complaint against Granada Investments, Inc., Granada Investments, L.P., Fairview Financial Corp., LBO Associates I, L.P., LBO Associates II, L.P., G.H. Enterprises, Inc., Andrew N. Heine, Trust f/b/o Jonathan Heine, Trust f/b/o Nancy Cedillo Heine, Trust f/b/o Priscilla Majerski, Trust f/b/o Adam Heine, Peter F. Pelullo, Global Financial Corp., and Leonard Pelullo. In the Counterclaim and Third–Party Complaint, DWG asserted claims for violations of Sections 10(b), 13(d), 14(a), 14(d), and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(d), 78n(a), 78n(d), and 78n(e), and the SEC rules and regulations promulgated thereunder, and sought injunctive relief and the imposition of a constructive trust in its favor. In addition, a claim was assert-

ed against Leonard Pelullo and Global Financial Corp. for breach of fiduciary duties.

On July 17, 1989, Granada filed a Motion For Leave To File *Instanter* a Verified Third Amended And Supplemental Complaint For Declaratory and Injunctive Relief (the "Third Amended Complaint"). In the Third Amended Complaint, Granada realleged the claims asserted in the previous Complaints and additionally asserted claims against Defendants Victor Posner and Steven Posner individually for alleged violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

Evidentiary proceedings on the preliminary injunction motions filed by Granada and DWG were commenced on September 11, 1989. Evidence on Defendants' alleged breaches of fiduciary duties was also heard. At the parties' request, the preliminary injunction hearing was adjourned to allow an opportunity for settlement negotiations.

In August 1990, the parties entered into a Stipulation Settlement ("Stipulation") which provided, among other things, for certain changes in the corporate governance of DWG. A limitation on the voting or disposition of shares of the Common Stock held by Victor Posner and the entities he controls; a relinquishment of certain contractual rent increases under DWG's Lease with Posner Trust No. 6, the Landlord of the Victorian Plaza Apartments; and the full and final settlement and dismissal, with prejudice, of and release of all claims of all the settling parties. In addition, the Stipulation provided that three persons, not affiliated with any parties to this action, would be appointed by the undersigned to serve on DWG's thirteen member Board of Directors along with two incumbent members of the DWG Board selected by the current DWG Board (who were not DWG employees or members of the Posner family) would comprise a newly created "Special Committee." This committee was to remain in place for up to five years from the date of the Final Order and Judgment. Under the Stipulation, the Special Committee could engage independent counsel and other advisors to advise it in connection with the duties set forth within the Stipulation. The Special Committee was required to report any violations of the Stipulation to the undersigned. Jurisdiction was retained over the enforcement of the Stipulation. Under the Stipulation, the Special Committee was empowered to review certain types of transactions between DWG and its subsidiaries, on the one hand, and (x) certain affiliated publicly-held corporations and/or (y) any entity or person controlled, directly or indirectly, by Victor Posner (other than the Company's subsidiaries), on the other hand. DWG was also expressly required to hold an annual meeting of shareholders each year, unless and until it ceased to be a public company. The failure to hold annual meetings was a leading shareholder claim against Victor Posner.

After reviewing its terms, on September 18, 1990, a preliminary Order was entered approving the Stipulation and the procedures suggested for providing notice to DWG shareholders on November 14, 1990. Pursuant to Federal Rule of Civil Procedure 23.1, a fairness hearing was held to determine the fairness, the reasonableness, and the adequacy of the Stipulation. Notice of the proposed stipulation was sent to all DWG shareholders of record informing them of the Stipulation and their right to be present at the hearing to express their opinions on whether the Stipulation should or should not be approved.

On February 12, 1991, a decree was entered which incorporated and approved the Stipulation. The decree improved corporate governance and imposed restrictions on self-dealing between DWG and Victor Posner, as well as a variety of Posner-related persons and entities. The decree imposed a system of democratic corporate governance at DWG, and named Mr. Daniel R. McCarthy, Mr. Richard M. Kerger, and Mr. Harold E. Kelley as Court–Designated Directors.

From the virtual outset of the settlement, the Court–Designated Directors reported being subjected to insulting and abusive behavior by Victor Posner. It appeared to the Court–Designated Directors that Posner did not intend to change his alleged business methods. This situation worsened and, in accordance with the decree, a DWG Board of Director's meeting was called by the Special

Committee on November 11, 1991. Victor Posner abruptly aborted this meeting within minutes of its commencement.

On November 14, 1991, in connection with their obligation to report violations of the Stipulation to the Court, the Court–Designated Directors filed "Special Directors Report and Recommendation No. 1" ("Report No. 1"). In Report No. 1, attention was drawn to Victor Posner's activities and transactions and occurrences that: (1) threatened to undermine the framework that was essential to the proper functioning of the parties consensual resolution of their dispute; (2) demonstrated an intent to circumvent the authority of the Special Committee to review and approve, in advance, transactions enumerated within the Stipulation; or (3) merely feigned adherence to the high standard of corporate behavior that underlies the Settlement Stipulation.

The Affidavits of Richard M. Kerger and Harold E. Kelley, which were attached as exhibits to Report No. 1, indicated that the disturbing financial and management practices of Victor Posner continued unchecked within DWG notwithstanding the safeguards imposed under the Stipulation.[1] Thus, judicial intervention was deemed necessary for enforcement of the Stipulation.

The Special Directors recommended that a hearing take place in Cleveland, Ohio, before the DWG shareholders meeting to make findings of fact regarding the suspected violations, and that the parties to the action and the Special Directors be authorized to conduct discovery on an expedited basis pursuant to stipulated discovery plans submitted for the completion of the necessary discovery in advance of the scheduled violation hearing.

Because of the issues raised as a result of Report No. 1, an Order issued on November 15, 1991, scheduling a hearing for December 10, 1991. The parties were directed to conduct necessary expedited discovery to address the issues of fact raised in Report No. 1.

On November 22, 1991, a Memorandum Opinion and Order was issued approving the discovery plans which were submitted requesting discovery and a determination regarding the extent to which the parties were required to comply.

On November 27, 1991, a discovery conference was held concerning the DWG's Request for Production of Documents issued to the Special Directors. The parties were ordered to produce any written communications, or any documents memorializing or documenting oral communications from the Board and the Special Directors to DWG or

---

1. Mr. Kerger's Affidavit detailed events surrounding the Board meeting which took place on November 11, 1991, which lasted less than five (5) minutes. The Special Committee had sent its Report and Resolutions dealing with problems sufficiently significant to require immediate action on November 5, 1991, but the meeting was adjourned because members of the Board claimed that they did not have a sufficient amount of time to consider the matters raised by the Special Committee. Also in his Affidavit, Mr. Kerger noted the particular conduct of Victor Posner that troubled the Special Committee, which included, among other things, the directive from Victor Posner to cause rental payments made by the subsidiaries and affiliates to Posner Trust No. 6, the Landlord of the Victorian Plaza Apartments, rather than to the Common Cost Center at DWG as required by the consent decree. In addition, Mr. Kerger detailed the attempt of Victor Posner to replace Roger Stake, Thomas Prendergast and William Pallot, all DWG Board members, after Victor Posner received criticism regarding his method of (finan-

cial) operation. The foregoing constituted a violation of the consent decree.

In Mr. Kelley's Affidavit, he set forth comparisons regarding DWG financial data from fiscal years 1990 to 1991, which supported the Special Committee's observation that a problem existed. The data reflected the self-interested actions of Victor Posner and his blatant disregard for the Court's directives under the consent decree. Specifically, violative intercorporate transactions have taken place following the execution and approval of the consent decree which constitute breaches of the fiduciary duty owed to DWG by Victor Posner which have taken on various forms including, among other things, accepting salaries from indebted subsidiaries and affiliates, diversion of rental payments to his personal Trust from subsidiaries and affiliates which are owed to DWG under a lease covering the Victorian Plaza Apartments, and the receipt of bonuses and/or incentive compensation by Victor Posner or his family and friends in violation of the consent decree.

any representatives thereof, concerning violations of the Stipulation.

On November 29, 1991, a Motion to Vacate the November 14, 15 and 22, 1991 Orders and Declaration That The Stipulation Be Construed Consistent With Its Plain Language and Intent Of Drafters was filed on November 29, 1991, by Defendants.

On December 4, 1991, Granada filed, under seal, a Motion For An Order To Show Cause Why Victor Posner And Steven Posner Should Not Be Held In Contempt For Violation Of The Consent Decree. Additional relief requested included a determination that sanctions should be ordered with regard to Victor and Steven Posner's failure to comply with the consent decree, including the reimbursement to DWG of all sums of monies improperly diverted, directly or indirectly, to Victor Posner, Steven Posner, members of the Posner family, and friends of Victor Posner.

The charges of misconduct set forth in Report No. 1 were restated in the Motion, and Granada concluded that the Report No. 1 clearly established that violations had been properly demonstrated. Because a hearing was already scheduled for December 10, 1991, Granada requested that the issues raised in its Motion be addressed at the same time.

An Order issued on December 5, 1991, consolidating the hearings regarding the issues raised in Report No. 1 and Granada's Motion to Show Cause. This hearing took place on December 10, 1991.

On December 9, 1991, DWG, Victor Posner and his board filed a Motion For Recusal of the undersigned and Order To Show Cause Why December 10, 1991 Hearing Should Not Be Stayed.

On that same day, a Notice of Appeal of the November 27, 1991 Order, which ordered responses to discovery, was filed in the United States Court of Appeals for the Sixth Circuit by DWG.

On December 17, 1991, a joint meeting of the Special Committee and DWG representatives with the undersigned was held. Certain matters appeared to be resolved by the parties, namely, that (1) In the future, there will be no direct payments of rentals from DWG subsidiaries to Victor Posner Trust No. 6; (2) The potential of a sale of assets to reduce indebtedness should be pursued vigorously; (3) Lines of communication would remain open between Victor Posner and the Special Committee; (4) The Special Committee believed that a study of compensation paid to executive officers was necessary; and (5) The Special Committee believed that capital improvements to Victorian Plaza, costing in excess of $10,000, should be subject to prior Committee approval. Within seventy-two (72) hours of this meeting, on December 20, 1991, Victor Posner announced his intention to vote his shares for Martin J. Posner, his nephew, and Reverend Patrick O'Neill rather than Special Committee members William Pallot and Thomas Prendergast as required by the Consent Decree.

On December 26, 1991, pursuant to the November 29, 1991 request by DWG for a declaration, an Order granting declaratory and injunctive relief issued giving effect to the plain words of the consent decree, and resolving all pending motions. DWG's Motion for Recusal of the undersigned was denied.

On December 27, 1991, the Special Committee attended the annual meeting of shareholders required by the consent decree, in Miami, Florida, where the headquarters of DWG is located. Copies of the December 26, 1991 Order were presented to Victor Posner by the Special Committee prior to his voting his shares to expel Messrs. Prendergast and Pallot from the Board.

On January 13, 1992, DWG filed a Notice of Appeal with the Sixth Circuit from the December 26, 1991 Order. A stay of the Order was never fought or obtained.

On January 13, 1992, the Court–Designated Directors filed under seal with the District Court "Special Directors Report and Recommendation No. 2."

Report No. 2 set forth the events that occurred at the DWG shareholders meeting. Several shareholders expressed concerns related to the salaries and benefits received by

Victor Posner and his family members. A cumulative vote for the members of the new Board of Directors was taken. In blatant defiance of the Stipulation and December 26, 1991 Order, Messrs. Pallot and Prendergast were not elected. Instead, Victor Posner caused the election of his nominees, Father O'Neill and Martin J. Posner. That meeting was adjourned shortly thereafter.

Report No. 2 also noted details surrounding the December 27, 1991 meeting of the Board of Directors. Votes were taken concerning the selection of members for several DWG Committees. All votes resulted in a 10 to 3 outcome, Victor Posner and the nine directors he controlled versus the Court–Designated Directors. Much debate took place when the discussion focused on the membership of the Special Committee. Comments were offered concerning the directives and requirements contained within the December 26, 1991 declaration. Some of the other issues addressed by the Board included compensation of the Directors, the proposed appointment of Victor Posner as Chairman and CEO of DWG, and review of the proposed Resolutions of the Special Committee regarding compliance with the Consent Decree. The Court–Designated Directors concluded that "in all material respects, the December 26, 1991 Order (giving affect to the plain words of the consent decree as controlling), had been ignored." Specifically, the Special Committee reported that: (a) candidates required to serve on the Special Committee (as Directors) were improperly voted out of office; (b) salary payments by companies indebted to DWG had been demanded by Victor Posner, who refused to refund such amounts; and (c) Victorian Plaza rental payments had been paid as a preference to Posner Trust No. 6 by reason of the orders of Victor Posner.

Following review of the Special Committee Report No. 2, on February 6, 1992, Plaintiff Granada filed a Motion For An Order To Show Cause Why Victor Posner And Steven Posner Should Not Be Held In Contempt. The relief requested by Granada included: (1) ordering the Posners to reimburse DWG for all sums of monies improperly diverted directly or indirectly to them in violation of the February 12, 1991 decree; (2) removing Martin J. Posner and Reverend Patrick O'Neill from the Special Committee of the Board of Directors of DWG Corporation; and (3) removing Victor and Steven Posner from their positions as officers and directors of DWG.

On February 13, 1992, a Supplemental Affidavit to Report No. 2 was filed under seal, by Harold E. Kelley, Chairman of the Special Committee. Mr. Kelley discussed Pennsylvania Engineering Company's ("PEC") bankruptcy, the affect of this bankruptcy on DWG, and the potential for the recovery of the debts owed by PEC to DWG. Mr. Kelley discussed in detail the indebtedness of the various companies controlled by Victor Posner like APL Corporation ("APL"), Insurance and Risk Management Company ("IRM"), NVF Company and Salem Corporation, which despite their indebtedness to DWG, were required to pay excessive salaries to Victor Posner and his family members while shifting debt to DWG and failing to repay DWG loans made to these companies at the behest of Victor Posner. According to Mr. Kelley, Victor Posner abused his position with lavish, expensive meals and entertainment expenses. Mr. Kelley concluded that Victor Posner used his control to systematically shift the assets of DWG and its subsidiaries to other Posner-controlled companies to the detriment of DWG, while effectively draining DWG's resources.

The recommendations of Mr. Kelley included the immediate suspension of Victor Posner and Steven Posner from DWG, the freezing of all DWG stock held by Victor Posner and the placement of such stock into a trust; the restoration of Messrs. Pallot and Prendergast to the Board and Special Committee; the repayment/return of all rent, salary and expenses paid to Victor Posner, Steven Posner or the Posner Trust No. 6, from the December 26, 1991 Order to the present; criminal contempt sanctions against Victor Posner; and the appointment of a receiver.

On February 24, 1992, a hearing commenced concerning the February 6, 1992 Motion To Show Cause Why Relief Should Not Be Granted As Against Victor Posner and

Steven Posner. Also, DWG's Motion to Recuse the undersigned was renewed.

Following several days of testimony, on March 4, 1992, a Notice of Prosecution for Criminal Contempt issued charging Victor Posner with five (5) counts of criminal contempt of Court for willful misconduct under the provisions of 18 U.S.C. § 401(3) and § 402. The Notice requested the U.S. Attorney to prosecute the action and schedule a trial for May 4, 1992, on such charges at which time Victor Posner was directed to appear and show cause why he should not be punished for criminal contempt.

On that same day, in order to reduce expense and delay associated with in-court proceedings concerning the complex and convoluted organizational structure of DWG and Victor Posner's alleged exploitation of this morass to his advantage, an evidentiary audit of DWG was ordered under the provisions of Fed.R.Civ.P. 53.

On March 9, 1992, an Order issued to cause the Transfer of Criminal Issues, memorializing the procedures announced at the March 4, 1992 hearing and bifurcating the action into separate civil and criminal proceedings.

A Notice of Appeal to the Sixth Circuit Court of Appeals from the February 21, 1992 and March 4, 1992 Orders was filed on March 10, 1992, by DWG.

On April 6, 1992, an Order issued provisionally staying the appointment of an auditor contemplated by the March 4, 1992 Order under Fed.Civ.R. 53, on the condition that the Chief Financial Officer of the Company and the Company's independent accountants, Arthur Andersen & Company ("Arthur Andersen"), provide to the parties and the Special Committee the items of information specified in such March 4, 1992 Order within thirty (30) days, subject to reasonable extension.

A Motion to Intervene alleging common law breaches of fiduciary duty since February 12, 1991 was filed by Irving Brilliant, et al. on April 20, 1992.

After receiving an audit-plan from the Court–Designated Directors, Arthur Andersen commenced an audit of DWG on April 27, 1992. This audit was later filed by Arthur Andersen under seal.

On May 6, 1992, the Sixth Circuit Court of Appeals issued an Order dismissing all pending appeals in the *Granada* litigation, 961 F.2d 1577. The Sixth Circuit Order denied DWG's Petition for Writ of Mandamus to compel recusal of the undersigned, denied DWG's Motion for a Stay of the Proceedings in District Court, and granted Granada's Motion to Remand.

A DWG Board of Directors meeting was held on May 19, 1992. Reportedly discussion occurred concerning required membership of the Special Committee, and the continued applicability of the December 26, 1991 Order to the parties. Despite this activity, Victor Posner persisted in his defiance of these authorities.

On June 12, 1992, a separate shareholders' derivative and class action, on behalf of DWG corporation by and through *Irving Cameon et al.*, was brought against DWG, the members of DWG's Board of Directors (hereinafter collectively referred to as "DWG"), other than the Court–Designated Directors. This action asserted claims subsequent to February 12, 1991, the date of the approval of the Stipulation. The Complaint (the "Cameon Complaint") stated, among other things, certain breaches of fiduciary duty, violations of the proxy solicitation process of §§ 14(a) and 27 the Securities Exchange Act of 1934 and Rule 14(a) and other rules promulgated thereunder, claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and claims of mail and wire fraud under 18 U.S.C. §§ 1341, 1343 and 1957. According to the Cameon Complaint, Victor Posner caused DWG to issue and disseminate a Proxy Statement to DWG shareholders, that contained false and misleading information, as well as omitted vitally material facts. The RICO claims stated Victor Posner engaged in a fraudulent, deceptive, improper, and illegal scheme in order to maintain control of DWG.

The derivative allegations in the *Cameon* Complaint also included: the payment of ex-

cessive salaries, benefits and fees to Defendants, including Victor Posner and members of his family; payments of amounts to such persons by other corporations indebted to DWG in preference to the payment of amounts owed to the Company; payment of excessive rents for the Company's corporate headquarters in Miami Beach, Florida, to a Trust for the benefit of Victor Posner and his family; the charging of excessive personal expenses to DWG by Victor Posner, including meal and entertainment expenses; and engaging in a pattern of racketeering activity.

The class claims asserted in the *Cameon* Complaint were filed on behalf of a class consisting of the Company's shareholders beneficial and of record as of December 2, 1991 who were eligible to vote at the Company's December 27, 1991 annual meeting (the "Class"). The alleged violations included violations of the Federal securities laws in connection with the solicitation by the Company and its directors (other than the Court–Designated Directors) of proxies for election of directors at such annual meeting. The *Cameon* Complaint sought injunctive relief, compensatory damages (including attorneys fees, expert fees and other related fees) and treble damages.

On June 15, 1992, a Board of Directors meeting took place. On June 18, 1992, DWG and its directors, (other than the Court–Designated Directors), filed an action for a declaratory judgment against Granada. The Complaint sought to obtain a declaratory judgment determining disputes which had arisen between DWG and Granada and the Court–Designated Directors with respect to certain provisions of the Stipulation regarding, among other things, the membership of the Special Committee under the Stipulation, compensation of Victor Posner and Steven Posner, and transactions which required the review and approval of the Special Committee.

On June 23, 1992, the Sixth Circuit Court of Appeals issued an Order denying DWG's Petition for Rehearing *En Banc.*

On June 26, 1992, the Court–Designated Directors filed with the District Court Special Committee Report and Recommendation No. 3 ("Report No. 3"). Report No. 3 concluded that there was little cause for optimism regarding Victor Posner's compliance with the Orders of the undersigned.

In Report No. 3, the Special Committee set forth the details surrounding the items covered at the March 18, 1992 Board of Directors meeting. According to the Report, there was extensive discussion regarding the election of individuals to the Board (Martin Posner and Father O'Neill), rather than those appointed by the Court (Messrs. Pallot and Prendergast). In addition, issues were raised regarding compliance with court orders, the potential for contempt charges, Victor Posner's salary payments and compensation, and the audit of DWG.

By reason of the alleged continued defiance of Victor Posner, on July 13, 1992, Granada filed a Motion For An Order To Show Cause Why Victor Posner, Steven Posner And The Other Defendant–Directors Of DWG Should Not Be Held In Contempt. The Motion was supported, among other things, by Special Committee Report No. 3, and stated:

1. In violation of paragraph 4(c)(iv)(c) of the Stipulation, notwithstanding the determination and direction of the Special Committee, the Defendant-directors have refused and failed to terminate and to cause DWG to terminate Common Cost Center services to affiliated companies owned or controlled by Victor Posner which are not current in their payments for the services provided.

2. Apparently on the advice of Victor Posner's obviously conflicted counsel urging that it was appropriate to ignore the Court's Orders of February 12, 1991 and December 26, 1991 pending their filing of miscellaneous appeals and other motions—all improperly financed by DWG and all of which the Defendant-directors knew had been denied by the Court of Appeals for the Sixth Circuit— in violation of Section 4(c) of the Stipulation, Victor Posner and the Defendant-directors have failed and refused to rein-

state Messrs. Pallot and Prendergast as members of the Special Committee.

3. Apparently on the advice of Victor Posner's obviously conflicted counsel, and in violation of Paragraph 4(c)(i) of the Stipulation, Victor Posner and the Defendant-directors have failed and refused to submit to the Special Committee for review and ultimate approval the issue of whether the DWG lease—which expires in nine months—should be renewed.

4. Victor Posner continued, directly and indirectly, to drain the coffers of DWG and the Defendant-directors have failed and refused to take appropriate corporate action to prevent him from doing so, all in violation of Paragraph 4(c)(ii) of the Stipulation.

5. Victor Posner has caused preferences to be granted to him by his affiliated companies which owe DWG millions of dollars, and the Defendant-directors have failed and refused to take appropriate corporate action to prevent him from doing so, all in violation of Paragraph 4(c)(i) and (ii) of the Stipulation.

6. Victor Posner and the Defendant-directors have breached the Stipulation by failing and refusing to take any steps necessary to insure that the Special Committee is able to fulfill its function under the Stipulation or to insure the compliance of DWG with its obligations under the Stipulation.

For the foregoing violations, Granada requested a hearing on the Motion, sought various forms of relief, including, but not limited to:

1. Ordering Victor Posner and the Defendant-directors to reimburse DWG for all sums of monies improperly diverted directly or indirectly to Victor Posner and his family and close associates in violation of the February 12, 1991 and December 26, 1992 Orders and the parties' Stipulation of Settlement in this case;

2. Removing Victor Posner, Steven Posner, Melvin R. Colvin, Bernard I. Posner, Russell A. Boyle, H. Douglas Kings-more, Martin J. Posner, Thomas M. Thompson, Father Patrick O'Neill, and W.C. Robinson from their positions as officers and directors of DWG;

3. Removing W.C. Robinson and Father Patrick O'Neill from the Special Committee of the Board of Directors of DWG Corporation and reinstating Thomas A. Prendergast and William L. Pallot;

4. Extending the term of the Stipulation of Settlement commensurate with the delay in its full implementation by Defendants;

5. Appointing a temporary receiver for DWG; and

6. Ordering Victor and Steven Posner and the other Defendant-directors to pay Granada's fees and expenses, including but not limited to its attorney fees incurred in its efforts to enforce the Stipulation and this Court's Orders relating to it.

In Report No. 3, the Court–Designated Directors detailed the major problems facing DWG, and stated that in their opinion the following remedies should be imposed immediately:

a. The suspension of Victor Posner as CEO and President of DWG;

b. Temporary appointment of an interim CEO with specific instructions not to take any instructions, direct or indirectly, from Victor Posner;

c. Return of Messrs. Pallot and Prendergast to the DWG Special Committee;

d. The return reimbursement of any rent, salary, or expenses paid to Victor Posner where such payments were contrary to the provisions of the February 12, 1991 consent decree in this action;

e. In the alternative, in accordance with the applicable provisions of federal and Ohio law the appointment of a receiver; and

f. Modification of the February 12, 1991 consent decree to reduce the size of the DWG Board, expand the Special Committee's strategic oversight of Victor Posner's dealings, and toll the effective period of the Stipulation to exclude intervals during which litigation is under-

taken by Victor Posner for the sole purpose of impeding settlement enforcement.

A Response On Behalf Of DWG Corp. To Report No. 3, was filed on July 14, 1992.

On July 17, 1992, the Report To The Special Committee Of The Board Of Directors And Parties In The Matter Of *Granada Investments, Inc. v. DWG Corporation, et al.* (the "Audit Report") of Arthur Andersen was filed with the Court. This Report contained and supported every allegation of misconduct alleged by the court-designated directors.

On July 23, 1992, a motion permitting shareholders to intervene in these proceedings and serve a shareholders derivative complaint in *Brilliant et al. v. DWG Corporation et al.*, against the Company and its current directors, other than the Court–Designated Directors, and certain former directors was granted. The Complaint (the "Brilliant Complaint") alleged certain derivative claims, some of which accrued prior to the date of approval of the Stipulation and some of which allegedly accrued subsequent thereto. The allegations in the Brilliant Complaint included, among other things, the alleged payments of excessive compensation to Victor Posner and members of his family, payment of excessive rents for the Company's corporate headquarters in Miami Beach, Florida to a Trust for the benefit of Victor Posner and his family, and other allegations which were similar to the allegations made by the Court–Designated Directors in their first and second Reports to the District Court. These alleged violations constituted violations of common law (fiduciary) duties and Rule 10b–5 of the Securities Act of 1934. The Brilliant Complaint sought an award of damages to the Company resulting from the alleged wrongful acts, together with attorneys' fees and other costs associated with prosecuting the action, and an injunction enjoining, among other things, Victor Posner and Steven Posner from receiving compensation from the Company or any subsidiaries or affiliates of DWG which were indebted to the Company in excess of reasonable compensation and enjoining Victor Posner or any Trust established for the benefit of Victor Posner and for his family from receiving rent in excess of reasonable rent to be determined in the action.

On July 6, 1992, Special Committee Report and Recommendation No. 4 ("Report No. 4") was filed with the Court. The Special Committee reported that the Audit Report as well as information contained in DWG's 1992 Form 10–K, which indicated that DWG would not survive 1993 as a going business concern, supported violations of the February 12, 1991 consent decree.

On August 10, 1992, it was ordered that the enforcement hearing which had been suspended on March 4, 1992, resume on August 24, 1992.

On August 24, 1992, evidentiary proceedings resumed in a joint hearing in the above captioned actions.

On August 25, 1992, all charges contained in the Notice to Victor Posner of Criminal Contempt Charges were dismissed with prejudice by the undersigned in light of the importance of obtaining Victor Posner's testimony in the civil enforcement proceedings. Victor Posner had invoked his privilege against self-incrimination on ninety-four occasions in response to questioning by Granada counsel concerning the allegations in the Special Committee Reports. Evidentiary proceedings were suspended to permit Victor Posner to reconsider his invocation of his privilege against self-incrimination in light of the dismissal of criminal charges against him, thereby removing his arguably blanket right in the face of possible criminal and civil proceedings.

On September 3, 1992, DWG, Victor Posner and certain related entities controlled by him entered into a Letter of Intent with Messrs. Peltz and May dated September 2, 1992, with respect to transactions that would provide for, among other things, the contemporaneous sale and exchange of all of Posner's Common stock in DWG, a reduction in the rent already owing and to be paid for the Leased Space, and resignation as Chairman of the Board and Chief Executive Officer of DWG.

A conference was conducted on September 10, 1992, to consider the Victor Posner pro-

posed settlement. In light of the potential for the proposal to achieve the remedial equivalent of continued enforcement of proceedings, the parties were afforded time to consummate their agreement.

On February 17, 1993, Victor Posner, Granada and the other parties to the Brilliant and Cameon actions entered into a Modification of the February 12, 1991 consent decree. The Modification provided, among other things, for the extension of the tenure of the Special Committee, modification of certain provisions of the Stipulation, the reimbursement of certain sums to Granada and the other Plaintiffs in amounts to be awarded or approved by the Court, the dismissal with prejudice of all of the claims raised by and against all of such parties and certain releases.[2]

### ATTACHMENT B

### PART 1

#### *ORDER AND FINAL JUDGMENT OF DISMISSAL*

A Hearing having been held before this Court on March 22, 1993, pursuant to this Court's Order of February 19, 1993 (the "Preliminary Order"), on the settlement set forth in the Modification of the Stipulation of Settlement dated February 17, 1993 (the "Modification"), in the above-captioned actions; and applications having been made for awards of attorneys' fees and disbursements as set forth in the Modification to be awarded to plaintiffs' counsel; and it appearing that due notice was given (the "Notice") in accordance with the Preliminary Order to DWG Corporation's ("DWG") shareholders as of December 2, 1991 and January 26, 1993; and the respective parties having appeared by their respective attorneys, and such attorneys having been heard; [and no person or entity having objected—or having objected and been heard in opposition] to the Modification, the terms of settlement of the alleged Derivative and Class Claims as set forth in the Modification, or the Brilliants' and Cameon's fee applications; and the settlement and fee applications having been considered by the Court, and the Court having made its findings of fact and conclusions of law;

IT IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. Capitalized terms used herein and not otherwise defined shall have the same meaning as set forth in the Modification (or, if not affected by the Modification, in the Stipulation).

2. Pursuant and subject to the provisions and conditions of Section 8 of the Modification: (i) The Complaint filed by the Brilliants and the alleged derivative claims in the Complaint filed by Cameon are properly maintained as derivative claims under Rule 23.1, Fed.R.Civ.P., on behalf of DWG; and (ii) and the claims asserted by Cameon for alleged violations of the federal securities laws are properly maintained as class claims under Rules 23(b)(1)(B) and 23(b)(2), Fed.R.Civ.P.

3. The Court hereby approves and adjudges the terms and conditions of the Modification and the terms of settlement of the Derivative and Class Claims set forth therein, to be fair, reasonable and adequate.

4. Paragraph 4(c)(i) of the Stipulation shall not apply to the following transactions and events:

(i) The payment of rent which is due and owing as a result of the Proposed Transactions or may become due and owing by the Company, now or hereafter, pursuant to or in connection with the Lease, including as amended by the Lease Extension, as provided hereinabove;

(ii) The issuance by the Company of convertible preferred stock to Victor Posner, SMC or Victor Posner Trust No. 20 ("Trust

---

**2.** The dismissal and releases to be given to the Defendants, under the terms of the Modification expressly excluded, and, therefore, would not bar, any of the Plaintiffs or any shareholders of the Company from asserting any claims for breach of the Modification and the Stipulation as amended thereby, arising subsequent to final approval of the Modification or any action by the Company to recover money damages for any payments misstated in, or omitted from, certain compliance certificates to be delivered pursuant to the Modification.

If the Modification and the settlement proposed therein is approved, upon the Closing the pending actions and proceedings will be settled and dismissed with prejudice.

No. 20") as a result of the Proposed Transactions, the declaration or payment of dividends or issuance of rights thereon, or the sale or other disposition thereof, in accordance with the Proposed Transactions, including any conversion of such preferred stock by Victor Posner, SMC, Trust No. 20 or any Related Persons or Permitted Transferees (as defined in the Exchange Agreement) thereof, for or into (and the related issuance of) any common stock pursuant to the Proposed Transactions, or any conversion, redemption, conversion call or put of any of such preferred or common stock pursuant thereto or any sale or assignment or conveyance of such preferred or common stock permitted thereunder or any adjustments in the ownership of stock occasioned by the payment of dividends or distributions, recapitalization or issuance of stock pursuant to any shareholders' rights plan; and such convertible cumulative preferred stock, whether or not held by Victor Posner, SMC, Trust No. 20, or their Related Persons or Permitted Transferees, shall have, and the Company shall honor, such designations, powers, preferences and rights as are set forth in the Amended Articles of Incorporation of the Company as approved and adopted by the shareholders prior to the Closing of the Proposed Transactions as contemplated by the Transactional Agreements; and the holder(s) of such convertible cumulative preferred stock (or the common stock into which it may be converted at such holders' option) shall have the right to exercise the rights under such preferred stock or common stock, as the case may be, without any further consent or approval of the Special Committee, the New Directors or the Court;

(iii) Any payment to Victor Posner or to any other person whose employment or position with the Company is terminated in accordance with the Transactional Agreements, pursuant to any rights in any written pension or deferred benefits plan(s) in force on September 1, 1992, which rights have vested as of September 1, 1992;

(iv) Payments to Steven Posner set forth in the Consulting Agreement with the Company, to be executed in connection with the Transactional Agreements;

(v) Transactions between (x) Victor Posner or any of the Posner Entities, on the one hand, and (y) any one or more Affiliated Companies on the other, including, but not limited to, any payment of principal or interest due and owing previously, now or hereafter to Victor Posner from any of the Affiliated Companies pursuant to any promissory note or loan agreement which was entered into at any time or the payment of any dividends to Victor Posner from an Affiliated Company or the granting of any bonuses or stock options by any such Affiliated Company and regardless of whether DWG claims to be or in fact is owed money by such Affiliated Companies; and

(vi) Transactions involving payment of rent or salary or bonuses, expense reimbursement or monetary or non-monetary compensation or benefits by any Affiliated Companies to Victor Posner or any member of his family or purported friend of his and regardless of whether DWG claims to be or in fact is owed money by such Affiliated Companies.

5. (a) For purposes of this Paragraph 5, "DWG" shall mean DWG and/or its non-publicly held subsidiaries, and the other non-publicly-held corporations listed on Schedules 1 and 2 annexed to the Stipulation and Schedule 1 annexed to the Modification.

(b) DWG, all shareholders of DWG, all past and present directors of DWG, and all parties to the above-captioned actions are hereby barred and permanently enjoined from instituting or prosecuting in this or any other jurisdiction any direct or indirect claims against Harold E. Kelley, Richard M. Kerger, Daniel R. McCarthy, William L. Pallot, Thomas A. Prendergast and the Special Committee, or any of its or their predecessors or successors, heirs, administrators, executors, and assigns, which are asserted or which might have been asserted in the above-captioned actions, including, but without limitation, any and all claims, demands, rights, actions, and causes of action (whether direct or indirect), known or unknown, that have been or could have been asserted by DWG, any of the shareholders of DWG, all past and

present directors of DWG, and all parties to this action, against the Special Committee or any of the persons described above, in connection with, arising out of, or in any way related to, any act, failure to act, omission, representation, fact, event, transaction, occurrence, or other matter set forth, alleged, embraced, underlying, or otherwise referred to in the Dismissed Claims, the Reports of the Special Committee, and any actions taken as directors of DWG, or pursuant to the Transactional Agreements or any agreement executed or document prepared pursuant thereto, including the issuance of any securities or any conversion of DWG common stock to preferred stock or any approval or disapproval of a transaction (including a refinancing of DWG debt) during the Effective Period, except for claims arising from breach of the Modification or any representation provided pursuant thereto occurring subsequent to the date hereof.

(c) These actions are hereby dismissed with prejudice including all claims, demands, rights, actions, and causes of action (direct or indirect), known or unknown, that have been, or could have been asserted by DWG, the Defendants or any party in privity with them, against Granada Investments, the Brilliants and Cameon in connection with, arising out of, or in any way related to any act, failure to act, omission, representation, fact, event, transaction, occurrence, or other matter set forth, alleged, embraced, underlying, or otherwise referred to in the above-captioned actions, and any claims, actions, or causes of action for injunctive or declaratory relief, money damages, restitution, breach of fiduciary duties, violations of the federal securities laws or obligations with respect to, or in any way related to, any of the foregoing from the beginning of time through the date hereof, except for the claims arising from breach of this Modification or any representation contained therein or provided pursuant thereto.

(d) DWG, all shareholders of DWG, all past and present directors of DWG, and all parties to the above-captioned actions are hereby barred and permanently enjoined from prosecuting in this or any other jurisdiction any direct or indirect claims against Granada Investments, or any of its respective predecessors or successors, heirs, administrators, executors, and assigns, and any and all of its past and present directors, officers, employees, agents, investors (and each of their heirs, executors, or administrators), which were or are asserted or which might have been asserted in the above-captioned actions, including, but without limitation, any and all claims, demands, rights, actions, and causes of action (whether direct or indirect), known or unknown, that have been or could have been, asserted by DWG, any of the shareholders of DWG, all past and present directors of DWG, and all parties to this action, against Granada Investments or any of the persons described above, in connection with, arising out of, or in any way related to, any act, failure to act, omission, representation, fact, event, transaction, occurrence, or other matter set forth, alleged, embraced, underlying, or otherwise referred to in the above-captioned actions, and any actions, causes of action, or claims for declaratory or injunctive relief, money damages, restitution, or breach of fiduciary duties, violations of the federal securities laws, obligations with respect to or in any way related to any of the foregoing matters from the beginning of time through the date of entry of the 1993 Final Judgment, except for claims arising from breach of the Modification or any representation provided pursuant thereto occurring subsequent to the date hereof.

(e) The above-captioned actions and proceedings, including the Derivative and Class Claims, Granada Investment's Motions to Show Cause, the Brilliants' Complaint, the Cameon Complaint, the Cameon Motion for a Preliminary Injunction and the Special Committee's Reports and Recommendations, and all claims that could have been asserted therein or with respect to the Arthur Andersen Audit Report or the Proposed Findings of Fact and Conclusions of Law submitted by the Special Committee and/or the motion papers, briefs, other documents or testimony filed in these actions, including depositions with respect to any of the foregoing are hereby dismissed with prejudice and released, including all claims, demands, rights, actions and causes of action (whether direct

or indirect), known or unknown, that have been or could have been asserted by Granada, the Brilliants, Cameon, DWG, or any shareholder individually, as a class or other representative, or derivatively on behalf of DWG, or in any other representative capacity, against DWG, any of the Defendants, the Posner Entities or any members of the family of Victor Posner based on positions held by any of them with DWG or any Affiliated Companies, in connection with or arising out of, or in any way related to, any and all Dismissed Claims except for claims arising from breach of the Stipulation and 1991 Final Judgment and the Modification or any representation contained therein or provided pursuant thereto occurring subsequent to the date hereof.

(f) Granada, the Brilliants, Cameon, DWG (directly or through any person purporting to act on its behalf, whether derivatively or otherwise), all shareholders, all past and present directors of DWG, and all parties to the above-captioned actions are hereby barred and permanently enjoined from instituting or prosecuting in this or any other jurisdiction any claims against any of the Defendants, the Posner Entities, or any of their respective predecessors or successors, heirs, administrators, executors and assigns, and any and all of their past or present directors, officers, employees, attorneys in fact, agents and representatives (and each of their heirs, executors or administrators), which were or are asserted or which might have been asserted in the above-captioned actions and proceedings, including, but without limitation, any and all claims, demands, rights, actions and causes of action (whether direct or indirect), known or unknown, that have been or could have been asserted by Granada, the Brilliants, Cameon, DWG or any shareholder individually, as a class or other representative, or derivatively on behalf of DWG, or in any other representative capacity, against DWG or any of the persons described above, in connection with, arising out of, or in any way related to, any and all Dismissed Claims and any actions taken pursuant to the Transactional Agreements or any agreement executed or document pre-

pared pursuant thereto, including the issuance of any securities or any conversion of DWG preferred stock to common stock or any approval or disapproval of a transaction (including a refinancing of DWG debt) requiring the consent of Victor Posner, during the Effective Period, except for claims arising from breach of the Stipulation and 1991 Final Judgment and the Modification or any representation contained therein or provided pursuant thereto occurring subsequent to the date hereof.

6. DWG is not subject to the provisions of the Ohio Control Share Acquisition Act, Ohio Rev.Code §§ 1701.831, and of Ohio Rev.Code §§ 1704.01–1704.07.

7. Fort & Schlefer, counsel for the Brilliants, is hereby awarded the sum of $195,000.00 for legal fees and expenses; Kaufman & Cumberland Co., counsel for the Brilliants, is hereby awarded $50,000.00 for legal fees and expenses; Greenfield & Chimicles, and Murray & Murray, counsel for Cameon, are hereby awarded $200,000 for legal fees and expenses. The foregoing fees and expenses awarded to counsel for the Brilliants and Cameon shall be payable by DWG at the Closing.

8. Without affecting the finality of this Final Judgment in any way, the Court hereby retains jurisdiction to enforce the terms of the Stipulation and Modification.

9. The Court finds, pursuant to Rule 54(b), Fed.R.Civ.P., that this Final Judgment is the final judgment for purposes of appeal, there being no just reason for delay in the entry of a final judgment, notwithstanding other matters presently pending, and the Clerk is hereby directed to enter judgment herein.

## ORDER AND FINAL JUDGMENT OF DISMISSAL

Having considered the parties' joint request to dismiss civil contempt proceedings in Case No. 1:89CV0641 and claims for declaratory relief in Case No. 1:92CV1206, it is hereby Ordered, Adjudged and Decreed that these claims are dismissed with prejudice.

IT IS SO ORDERED.

AT CLEVELAND, OHIO

DATED: April 21, 1993

*FINAL ORDER AND JUDGMENT*

In accordance with the Order and Final Judgment of Dismissal entered contemporaneously herewith in Case Nos. 1:89 CV0641 and 1:92 CV1164, the above-captioned actions are settled and dismissed with prejudice.

IT IS SO ORDERED.

Done at Cleveland, Ohio, this 21st day of April, 1993.

FINAL ORDER AND JUDGMENT

In accordance with the Order and Final Judgment of Dismissal entered this day, dismissing civil contempt proceedings in Case No. 1:89CV0641 and proceedings for declaratory relief in Case No. 1:92CV1206, these actions are hereby dismissed and terminated.

IT IS SO ORDERED.

AT CLEVELAND, OHIO

DATED: April 21, 1993

PART 3

ORDER ESTABLISHING TIMELINE FOR THE CLOSING OF DWG CORPORATE ACQUISITION

It has been reported by the court-designated directors to DWG Corporation, that DWG Shareholders have voted to authorize the amending of their Corporate Articles, to facilitate the acquisition of a controlling interest in DWG, by Messrs. Nelson Peltz and Peter May, general partners in DWG Acquisition Group, L.P. Accordingly, I have this day issued Final Orders and Judgments dismissing all claims in these actions, having determined that the resolution proposed by the parties, based on this acquisition, is fair, reasonable, adequate, and the remedial equivalent to relief being sought in these proceedings.

At 10:30 a.m., April 26, 1993, United States Courthouse, in Cleveland, Ohio, a hearing will be conducted to confirm the occurrence of all conditions preceding the closing and the fact of closing of the acquisition by Messrs. Peltz and May. In order to assure compliance with the terms of the Orders and Final Judgments entered today dismissing the claims alleged here, this separate Order issues to identify those closing events that on April 26, 1993, the court-designated directors must advise me have occurred, in order to render these dismissals appropriate. Accordingly, in accordance with the terms of the Settlement proposed by the parties, it is expected that on April 26, 1993, confirmation will be provided in open court of the occurrence of the following closing events upon which dismissals of these actions is conditioned:

1. DWG Special Committee approval for modification of the Victorian Plaza Lease.

2. *Joseph E. Kovacs, et al. v. NVF Co., et al.*, Court of Chancery of the State of Delaware, Civil Action No. 8466, Ad Hoc Intercorporate Transaction and Common Officer Compensation Committee approvals of the following:

 a. The Exchange of one-half of Victor Posner's common stock for preferred

 b. Victorian Plaza Lease Modification

 c. Purchase of minority interests in DWG subsidiaries

 d. Dissolution of the Ad Hoc Committee

 e. Stock Purchase Agreement for Insurance and Risk Management (IRM) and the sale by DWG of 250 shares of IRM owned by it

 f. Stock Purchase Agreement for Chesapeake Financial Corporation (CFC) Stock and the purchase by DWG from IRM of 324,300 shares of CFC

 g. Stock Purchase Agreement for Southeastern Public Utilities Company (SEPSCO) stock and the purchase by DWG from Security Management Corporation (SMC) and Victor Posner of 721,931 shares of SEPSCO

 h. Stock Purchase Agreement for Wilson Brothers stock and the purchase by DWG of 161,800 shares of Wilson Brothers common stock

 i. Stock Purchase Agreement with NVF re: CFC stock and the purchase by

DWG of 141,000 shares of CFC common stock from NVF

3. Current DWG Board of Directors approval of the following:

a. Reconstitution of membership of Board effective upon closing

b. The election of Messrs. Peltz, May and Kalvaria as officers effective upon closing

c. Approval of matters in connection with closing of transactions:

(1) Lease Modification

(2) Registration Rights Agreement with DWG Acquisition

(3) Registration Rights Agreement with SMC

(4) Steven Posner Consulting Agreement

(5) Filing of listing applications with American Stock Exchange and Pacific Stock Exchange for Class A Common Stock

(6) Borrowing of $75 million from Royal Crown

(7) Borrowing of $66.5 million from Graniteville

(8) Purchase from National Propane shares of CFC (1.4%) and SEPSCO (0.2%) owned by National Propane for $3.9 million

(9) Amendment to the Articles of Incorporation

(10) Spinoff Letter for Exchange Agreement

(11) New form of stock certifications

(12) Reservation of 4,985,722 shares of Class A Common Stock and 4,985,722 shares of Class B Common Stock for issuance upon conversion of Cumulative Convertible Preferred Stock

(13) Execution of Stock Purchase Agreements with DLJ and Merrill Lynch

(14) Issuance of shares to Donaldson, Lufkin and Jenrette (DLJ) and Merrill Lynch

(15) Execution of Registration Rights Agreements with DLJ and Merrill Lynch

4. Wilson Brothers Board meeting and the taking of requisite action.

5. SEPSCO Board meeting to elect new directors and officers effective as of closing.

6. All Transaction Documents identified below should be prepared and available at the closing:

a. Stock Purchase Agreement transaction documents

b. Exchange Agreement

c. IRM Stock Purchase Agreement

d. Stock Purchase Agreement re: CFC stock

e. Stock Purchase Agreement re: SEPSCO stock

f. Stock Purchase Agreement re: Wilson Brothers stock

g. Stock Purchase Agreement w/NVF re: CFC stock

h. DLJ/Merrill Equity Investments

7. All Closing Documents listed below should be prepared and available at the closing:

a. Stock Purchase Agreement

b. Exchange Agreement

c. IRM Stock Purchase Agreement

d. Stock Purchase Agreement re: CFC stock

e. Stock Purchase Agreement re: SEPSCO stock

f. Stock Purchase Agreement re: Wilson Brothers stock

g. Stock Purchase Agreement w/NVF re: CFC stock

h. DLJ/Merrill Equity Investments

8. Report as to plans to cause the preparation and filing of the following with the Securities and Exchange Commission subsequent to the closing:

a. Stock Purchase Agreement for acquisition of DWG Corporation

b. Stock Purchase Agreement in relation to Wilson Brothers

This dispute involves an area of vital concern to the American economy, corporate governance. The restoration of corporate democracy, fair corporate governance, and high standards of corporate ethics and integ-

rity are essential to promote DWG's long-term durability. Public confidence in DWG and increased shareholder value have been realized in large measure, by reason of the careful, devoted, and expert manner in which the court-appointed directors have executed their settlement role. The highly complex transactions that are associated with the closings here, involve DWG assets or property for which the shareholders may ultimately be liable, if unforeseen events or exigencies interfere with the closing as scheduled. Confirmation from the court-appointed directors that either they or counsel for the Special Committee have monitored the closing events discussed above, is required to assure that every aspect of the transaction in which this settlement is grounded has been accomplished. Accordingly, the parties are directed to commence completion of closing activities. A completion report, in accordance with the procedures outlined above, should be given on April 26, 1993, in Cleveland, Ohio.

IT IS SO ORDERED.